**FILED**

UNITES STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

2008 JUN 13 P 3: 39

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

STAR BROADCASTING, INC.
9672 Upton Road
Bloomington, MN 55431,

Plaintiff,

v.

REED SMITH LLP,
3110 Fairview Park Drive, Suite 1400
Falls Church, VA 22042,

Defendant.

Civ. Action No. 1:08CV616 CMH/JFA

JURY TRIAL DEMANDED

## COMPLAINT FOR DAMAGES
(Legal Malpractice, Breach of Fiduciary Duty
<u>Breach of Duties of Agent</u>

Plaintiff Star Broadcasting, Inc. ("Star"), for its complaint against Reed Smith LLP ("Reed Smith"), alleges as follows:

<u>Summary of Action</u>

1. This action is brought by Star for damages arising from a protracted period of substandard legal work performed on behalf of Star by Reed Smith in connection with the negotiation, execution, implementation and aftermath of a contract between Star and the United States Defense Commissary Agency ("DeCA"). Based upon the presumed validity of the contract, Star sought and obtained millions of dollars of financing and installed in-store radio stations in United States military commissaries both within the Continental United States and outside the Continental United States.

2. However, a key term regarding how Star was to receive most of its revenue was undefined in the contract and DeCA refused to perform as Star requested,

stating that to do so would violate DeCA's governing statutes and ethical rules. Upon DeCA's refusal to perform, upon information and belief, Reed Smith did not counsel Star about its potential rights under Federal Acquisitions Regulations ("FAR") Part 50, implementing Pub. L. NO. 85-804, 72 Stat. 972 (1958), codified as amended at 50 U.S.C. §§ 1431-35 (2000), and allowed the applicable statutory limitations period to expire. Upon information and belief, Reed Smith did not advise Star to promptly file a claim with the contracting officer under the Contracts Disputes Act, 41 U..S.C. §§ 601 *et seq*. Upon information and belief, Reed Smith counseled Star to continue working on the contract, incorrectly advising Star that it would just increase its damages if it did so.

3. Upon information and belief, Reed Smith represented to Star in words or substance that "when the time came, Reed Smith would sue the government for Star and that Reed Smith would take the case on a contingency fee basis." After the contract was terminated by the government, Reed Smith's Pittsburgh, Pennsylvania, office sent the president of Star to its office in Fairfax, Virginia, for the purposes of proceeding towards litigation against the government. Subsequently, the Pittsburgh office said that the Fairfax office would require a retainer of $150,000 to pursue a claim against the government. Upon information and belief, Reed Smith knew full well that Star could not afford the requested amount. Upon information and belief, Reed Smith continued to lull Star into believing that the government was wrong, without explaining how Star could overcome an adverse decision previously made in a similar case. Upon information and belief, Reed Smith did not advise Star that Reed Smith had a potential conflict of interest due to its inadequate legal work.

4. At a meeting at the Pittsburgh office in the fall of 2007, Star learned for the first time, in words or substance, that Reed Smith "did not do the work at the time to determine whether Star's contract was lawful and could be enforced against DeCA." Star also learned that Reed Smith considered the key revenue provision, which referred to a "Cooperative Advertising Agreement" between Star and DeCA, was undefined and "*sui generis,*" thus acknowledging that there had been no "meeting of the minds" between Star and the government. Reed Smith committed malpractice, breached its fiduciary duties and breached its duties as an agent by reason of which Star suffered damages. Star is entitled to recover its damages from Reed Smith.

## Jurisdiction And Venue

5. The Court has jurisdiction pursuant to 28 U.S.C. § 1332 (diversity of citizenship). This action involves citizens of different States and the matter in controversy exceeds the sum of value of $75,000, exclusive of interest and costs.

6. Venue is proper in this district and division pursuant to 28 U.S.C. § 1391(a) and Local Rule 3(C), as a substantial part of the events or omissions giving rise to the claim occurred here and Reed Smith is subject to personal jurisdiction here.

## Parties

7. Star is a Minnesota corporation, with its principal place of business in Bloomington, Minnesota. Star is involved in the business of providing satellite delivered music and advertising.

8. Upon information and belief, Reed Smith is a Delaware LLP, with offices across the United States and with related offices around the world. The offices relevant to this action are located in Pittsburgh, Pennsylvania, and Fairfax, Virginia.

## Facts

9.  Upon information and belief, Glenn R. Mahone, Esq., ("Mr. Mahone") is a partner of Reed Smith, resident in its Pittsburgh office, and has been at all times relevant to this Complaint. In 1999, Star asked Mr. Mahone for Reed Smith's services in negotiating and drafting a contract between Star and DeCA for the provision by Star of in-store radio in DeCA's commissaries both in the Continental United States and outside the Continental United States.

10. Mr. Mahone agreed to provide Reed Smith's services to Star; however, he did not provide a written engagement letter and, to this day, there has not been disengagement, either orally or in writing.

11. In order to accomplish the negotiations, Mr. Mahone traveled to North Virginia, as DeCA's principal offices are located at 1300 E. Avenue, Fort Lee, Virginia 23801-1800.

12. On March 12, 1999, Mr. Mahone advised Star to enter into a contract with DeCA, entitled "Defense Commissary Agency, In-Store Radio License Agreement. ("Agreement"). Pursuant to paragraph 1 of the Agreement (in pertinent part), Star agreed to make a major investment in the project:

> At its sole expense, STAR shall design, equip and install a satellite delivered (or other suitable program delivery system) In-Store Radio Network capable of broadcasting directly to each DeCA commissary throughout the world as set forth in Appendix A. .... STAR will be responsible for all costs associated with the installation and connection of the Network to DeCA's existing communication devices. Where communication devices do not exist, STAR will provide and install all required equipment necessary for the Network and retain its ownership.

13. Pursuant to paragraph 2 of the Agreement, STAR agreed, in pertinent part, to "have the sole responsibility to operate and maintain the Network at its sole cost."

14. As provided by paragraph 5 of the Agreement, DeCA was to use its "best efforts to assist STAR in the development of an effective advertising inventory sales program with key personnel" in fourteen ways, identified (a) through (m). Paragraph (a) states that DeCA will use its best efforts toward:

> Development and implementation of a vendor cooperative advertising program (including other forms of non-traditional revenue), with a targeted minimum of one-quarter (1/4) of (1) percent participation rate designated for the Network.

15. Pursuant to paragraph 10 of the Agreement, revenues were to accrue a set out in Appendix C to the Agreement. The Appendix made clear that this revenue was to compensate Star for its investment in the Network:

> In order to defray the cost of designing, installing, equipping and maintaining the Network for the benefit of its vendors, DeCA shall develop and implement procedures, with the buyers and merchandise managers, to inform vendors of the In-Store Radio Network program at the time or before purchase orders are placed and encourage their full participation in the In-Store Radio advertising and promotion opportunities available through STAR and the Network. A cooperative participation rate for all vendors and service contractors would be a targeted minimum of one-quarter (1/4) of one percent (1%) of all DeCA purchases designated for In-Store Radio.

16. Appendix C also included provisions for Star to give some of its revenue to DeCA and set forth an "Annual Net Revenue Schedule," which envisioned annual revenue in excess of $11,000,000. Upon information and belief, at all times relevant to the Complaint, DeCA's purchases were approximately $5.1 billion, making Star's anticipated income approximately $10,025,000 per year after payments to DeCA.

17. Paragraph 9 of the Agreement provided for an initial five year term, commencing upon installation of the top 50% of commissary stores by sales volume and renewable for an additional four year period. The Agreement could not be terminated

5

during the initial five year term or initial four year extension in the absence of a material uncured breach. However, DeCA could refuse to renew for the additional period if it decided to eliminate the Network and all forms of the Network broadcast advertising programs in its commissaries. Thereafter, the parties could extend the term for an additional four year period.

18. Following execution of the Agreement and based upon the revenues anticipated from Appendix C to the Agreement, Star raised money and committed its resources to installation of the Network at in the commissaries at its own expense.

19. By December 2000, Star had completed the top 50% commissaries, setting off the initial five year contract term. However, DeCA had still not agreed to a Cooperative Advertising Agreement, so that Star was not getting its anticipated revenue and was being stretched thin. Because it was not receiving the anticipated revenue, Star had financial difficultly building out and maintaining the system. Upon information and belief, Reed Smith did not discuss with Star either the provisions of FAR Part 50, making a claim to the contracting officer, or seeking relief on the grounds that there was no meeting of the minds on the most material provision of the Agreement as far as Star was concerned.

20. Despite repeated efforts by Star to get the Cooperative Advertising Agreement in place, by October 7, 2002, none had been accomplished. On that date, DeCA employee Edna Hoogewind ("Miss Hoogewind") sent an e-mail to Star advising that she and another DeCA employee had been working on it, that they had "pulled up lots of information on the website regarding these type of agreements, however we cannot find anything remotely close to our situation nor any information that we can

adopt to our situation. That being all said, our next step is to say ..HELP!" Ms. Hoogewind requested an outline from Star.

21. Working with Mr. Mahone, Star sent over draft copies of what Mr. Mahone and Star envisioned as a Cooperative Advertising Agreement, including a First Amendment to the licensing Agreement.

22. By letter to Star dated June 18, 2003, DeCA employee, Doreen Cadigan ("Ms. Cadigan") identified herself to Star as the new contracting officer and flatly rejected Star's attempt at formulating a Cooperative Advertising Agreement:

> [W]e cannot accept your proposed first amendment nor your belief that the license agreement obligates DeCA to enter into cooperative advertising agreements with our suppliers. The Standards of Conduct for government personnel do not permit us to require that our suppliers use specific merchandising or advertising sources. The basis for DeCA carrying a particular product in its stores is product sales and brand name recognition, not because the supplier chose to purchase an in-store advertisement from your firm.
>
> Following our In-Store License Agreement, DeCA assists Star in the development and implementation of an effective advertising inventory sales program, within our regulatory limitations. We issued Notice to the Trade No. 99-31 on June 18, 1999 announcing availability of the In-Store Radio Network to our trading partners. Star's informational brochures and posters are displayed and available in our headquarters vendor presentation area. Information to our trading partners has been provided at American Logistics Association conferences. We issued Notice to the Trade 03-91 on May 20, 2003 regarding advertising initiatives, and it again reminded our suppliers of Star's available services.

23. Thus, on June 18, 2003, after Star installed in-store radio service both inside and outside the Continental United States, DeCA and Star did not have a meeting of the minds regarding this critical provision of the In-Store Licensing Agreement.

24. Upon information and belief, Mr. Mahone tried in vain to respond to DeCA's concerns. Upon information and belief, Mr. Mahone advised Star to continue

on, thereby increasing its damages for which it could sue the government later. Upon information and belief, Mr. Mahone did not discuss with Star FAR Part 50, making a claim to the contracting officer or other potential remedies. Upon information and belief, Mr. Mahone did not advise Star to promptly file a claim with the contracting officer under the Contracts Disputes Act. Upon information and belief, Mr. Mahone advised Star to continue working on the Network, which would increase its damages to claim at a later time.

25. In 2003, a decision, *PinPoint Consumer Targeting Serves., Inc. v. United States*, 59 Fed. Cl. 74 (2003), was issued. The *PinPoint* case dealt with a contract between PinPoint and DeCA, which was similar, but simpler than Star's, and also based upon a "best efforts" standard. In that opinion, the Judge found that DeCA had met the standard and that PinPoint's requests would have caused DeCA to violate 5. C.F.R. § 2635.702(c) (government employees cannot use their position or title or any authority to endorse any product, service or enterprise) and Department of Defense Ethics Regulations, specifically DOD 5500.7-R § 3-209 ("Endorsement of a non-Federal entity, event, product, service or enterprise, may be neither stated nor implied by DoD or DoD employees in their official capacities and titles ... [and] may not be used to suggest official endorsement or preferential treatment of any non-Federal entity ...."). *Id.* at 84. The court also found that PinPoint did not understand the differences between public and government contracts and that PinPoint had failed in its duty to understand what DeCA could and could not do at the time of contracting. Upon information and belief, at least from the time the *PinPoint* decision was issued to the present, Reed Smith was and has been in a conflict position with its client.

26. DeCA terminated the contract at the end of the first five-year term and required Star to recover its equipment at its own expense. Because of the lack of revenue, Star was unable to recover some of the equipment and forfeited its rights to that equipment.

27. Upon information and belief, DeCA sought to install other equipment, which Star believed violated the provisions of its Agreement regarding the lack of extending beyond into the second four year period. Upon information and belief, Mr. Mahone requested $5,000 from Star. Upon information and belief, Mr. Mahone used the money to have the Star/DeCA file reviewed by the litigation department in Reed Smith's office in Fairfax, Virginia. Upon review of the file, Reed Smith did not offer to represent Star on a straight contingent fee basis. Reed Smith requested a retainer of $150,000. Upon information and belief, Reed Smith knew that this would force Star to seek other counsel. Reed Smith did, however, offer to continue providing assistance to Star and did respond to requests for information. Upon information and belief, Reed Smith continued to lull Star into believing that the government was wrong, without explaining how Star could proceed in the face of *PinPoint* and without running risks from the certification process. Further, upon information and belief, Reed Smith did not advise Star that any recovery from the government not geared toward shutting down operations or mitigating damages would likely be disallowed even if Star could make a claim against DeCA.

28. On October 17, 2007, Star met with Mr. Mahone in Reed Smith's Pittsburgh office. At the meeting, Star learned for the first time that Reed Smith had "not done the work at that time" to determine the legality of the contract negotiated by Mr. Mahone. Star also learned for the first time that Mr. Mahone had not seen a Cooperative

9

Adverting Agreement, such as the one proposed by him and Star, prior to the Star proposal to DeCA. Rather, Mr. Mahone stated that it would have been "*sui generis.*" Thus, it became clear to Star that there had been no "meeting of the minds" with DeCA over the critical revenue provision, as the terms were not clearly laid out in the Agreement.

29. As a direct and proximate result of Reed Smith's drafting of an In-Store Licensing Agreement with unenforceable provisions, including the failure of defining a lawful Cooperative Advertising Agreement at the time the Licensing Agreement was executed, Star has been damaged in that the contractual revenue stream to Star of approximately $10,025,000 per year was never achieved and Star has lost approximately $12,500,000 from setting up. operating and dismantling the in-store network in money, time, system design, legal fees, and other related expenses.

## COUNT I
### (Legal Malpractice)

30. The preceding paragraphs are realleged hereat as if set forth in full.

31. Reed Smith entered into a contract to provide legal services to Star in connection with Star's contract with DeCA.

32. As Star's attorneys, Reed Smith was obligated to provide competent representation to its client, Star. Such competence requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

33. As Reed Smith recognizes on its website, it has attorneys who specialize in government contracts. Upon information and belief, Mr. Mahone is not part of the government contracts group.

34. According to Mr. Mahone's profile on Martindale.com, Mr. Mahone practices areas are "corporate; finance." According to Mr. Mahone's Reed Smith profile, Mr. Mahone, he does not claim to specialize in government contracts, specifically Department of Defense contracts, or litigation.

35. Upon information and belief, Mr. Mahone did not have the legal knowledge, skill, thoroughness and preparation to competently represent Star in its relationship with DeCA. Upon information and belief, Mr. Mahone failed to appropriately involve Reed Smith's government contracts attorneys and has admitted that to Star that he "did not do the work at the time" to determine whether the contract he negotiated for Star was enforceable. Mr. Mahone failed to represent Star competently when he recommended that Star sign a contract with an undefined material term that Mr. Mahone admitted he did not understand and that was "*sui generis.*" Upon information and belief, Mr. Mahone improperly failed to consider FAR Part 50 or other relief under federal contracting law at the time DeCA refused to go forward with the Cooperative Advertising Agreement or at the time of the *PinPoint* decision, and misinformed Star as to its prospects of increasing damages by going forward and Reed Smith's willingness to represent Star against the government.

36. As Star's attorneys, Reed Smith was required not to represent Star if Reed Smith has a concurrent conflict of interest with a client. Such a concurrent conflict can occur where the representation of a client will be materially limited by a lawyer's personal interest.

37. Upon information and belief, Mr. Mahone had a conflict of interest with Star when it became clear that the failure to define the "Cooperative Advertising

Agreement:" was problematic, when DeCA refused to enter into a Cooperative Advertising Agreement based upon law and ethics, and following the *PinPoint* decision, which defined DeCA's best efforts, reiterated what was prohibited by law and ethics, and reminded that entities contracting with the government have to be educated on what the government can and can not do at the time of contracting. Upon information and belief, Reed Smith lulled Star into believing that Star's claims lay against DeCA to avoid and delay Star from examining Reed Smith's negligent legal representation.

38. As Star's attorneys, Reed Smith was required to communicate with Star, including explaining the matter to Star to the extent reasonably necessary to permit Star to make informed decisions regarding the representation.

39. By reason of the foregoing, Reed Smith breached its obligations to keep Star properly informed.

40. By reason of the foregoing, Star was directly and proximately damaged by Reed Smith and Star is entitled to recover its damages from Reed Smith.

## COUNT II
### (Breach of Fiduciary Duty)

41. The preceding paragraphs are realleged hereat as if set forth in full.

42. As Star's attorneys, Reed Smith had fiduciary obligations to Star.

43. By reason of the foregoing, Reed Smith breached its fiduciary duties to Star, which directly and proximately caused damages to Star. Star is entitled to recover its damages from Reed Smith.

## COUNT III
### Breach of Duties of an Agent

44. .The preceding paragraphs are realleged hereat as if set forth in full.

45. As Star's attorneys, Reed Smith had the duties of an agent, including to keep Star, its principal, fully informed about all matters coming to its attention of which Star should be aware, including those adverse to itself.

46. By reason of the foregoing, Reed Smith breached its duties to Star, which directly and proximately caused damages to Star. Star is entitled to recover its damages from Reed Smith.

WHEREFORE, Star respectfully requests that the Court award Star its damages in an amount to be proven at trial, interest, costs and attorney's fees, and such other and further relief as the Court deems just and proper.

## Demand for Jury Trial

Star respectfully requests trial by jury for all issues so triable.

Respectfully submitted,

Arthur M. Schwartzstein
Virginia Bar Number 41166
Attorney for Star Broadcasting, Inc.
ARTHUR M. SCHWARTZSTEIN, P.C.
1420 Spring Hill Road, Suite 600
McLean, VA 22102
Phone: 703-749-1282
Fax: 703-997-4054
amslaw@aol.com