

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

STAR BROADCASTING,            )
INCORPORATED,                 )
                              )
            Plaintiff,        )
                              )
V.                            )          Civil Action No. 08-0616
                              )
REED SMITH LIMITED LIABILITY  )
PARTNERSHIP,                  )
                              )
            Defendant.        )
_____)

## MEMORANDUM OPINION

This case is before the Court on Defendant's Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

Plaintiff, Star Broadcasting Inc. (hereinafter, Star), has brought this action against Defendant Reed Smith for legal malpractice, breach of fiduciary duty and breach of duty as an agent. Star filed the complaint on June 13, 2008. Star engaged Reed Smith to represent and assist it in negotiating and preparing a licensing agreement in 1999 between Star and the Defense Commissary Agency (hereinafter, DeCA), an agency of the U.S. Department of Defense.

As its name implies, DeCA is the federal government agency that, in 1998 and 1999, operated approximately 300 military

commissaries worldwide. Approximately 270 of those commissaries were located within the continental United States, and the remaining 30 commissaries were located outside the continental United States. Pursuant to a 1997 amendment to federal law, DeCA determined that it would seek contractors to develop advertising opportunities for DeCA's vendors worldwide. The vendors supplied DeCA with food and other grocery store products which generated approximately $5 billion annually in sales for DeCA. The advertisements for the vendors' products would be directed to DeCA's customers, the commissary shoppers.

In early 1998, DeCA issued a Request for Proposal (hereinafter, RFP) to identify contractors who could install, maintain and operate a satellite-based in-store radio broadcast network in all 300 DeCA commissaries worldwide. The RFP stated that the contract would require that the radio network provide music, announcements and advertising through satellite transmissions to all of DeCA's commissaries, and that it would be the responsibility of the qualifying contractor to sell the advertising to DeCA's vendors to cover the contractor's costs and any profit for the contractor. The contractor would also be required to pay a percentage of the resulting advertising revenue to DeCA as a commission.

Star was formed in approximately 1992. Pat DiPlacido is now and has always been Star's sole shareholder, as well as its

-2-

President and CEO. During the spring of 1998, Star submitted a proposal in response to the RFP. DeCA then invited Star to make an oral presentation to DeCA staff at DeCA's headquarters in Ft. Lee, Virginia. Pat DiPlacido accepted the invitation and made an oral presentation at DeCA's headquarters on November 10, 1998. In addition to making Star's oral presentation, Pat DiPlacido also provided written materials to DeCA's staff.

On or about February 8, 1999, DeCA informed Star that Star's proposal to install, maintain and operate the radio broadcast network in all 300 DeCA commissaries worldwide was acceptable, and that DeCA and Star needed to enter into a contract. Roberta Keeter (then Roberta Hollifield) (hereinafter, Ms. Keeter), a Contracting Officer at DeCA, sent Pat DiPlacido a draft contract, a document referred to as a "strawman" agreement.  The strawman agreement was a model format meant to initiate the contract drafting process. DeCA also scheduled a February 18, 1999 meeting with Star at DeCA's Ft. Lee headquarters to finalize the terms of the contract.

On February 8, 1999, Pat DiPlacido contacted Glenn Mahone (hereinafter, Mr. Mahone), a partner in Reed Smith's Pittsburgh office, and requested Mr. Mahone's (and Reed Smith's) assistance in negotiating the language of the final contract. Mr. Mahone understood that he (for Reed Smith) was being engaged by Star, at that time, " . . . to assist Star in achieving an agreement with DeCA to provide in-store music services."

-3-

In 1999, Mr. Mahone was a partner with Reed Smith in Reed Smith's Pittsburgh, PA office.  Mr. Mahone's practice was primarily in the area of business and commercial law, drafting and negotiating contracts.  Prior to that time, during the 1980s and early 1990s, Mr. Mahone had left Reed Smith and the practice of law and had pursued a business career, including the ownership of a commercial radio station in Richmond, Virginia and the ownership and operation of a nationwide satellite radio network.  In late 1993, after Mr. Mahone returned to the practice of law with Reed Smith in 1991, Pat DiPlacido sought out Mr. Mahone's (and Reed Smith's) services, at least in part because of Mr. Mahone's radio background, to help resolve a dispute Star had with some of its investors.  Pat DiPlacido had been introduced to Mr. Mahone by his brother, Frank DiPlacido, and was aware of Mr. Mahone's background in the radio industry.  Mr. Mahone was successful in helping Star resolve that dispute.

In addition to calling Mr. Mahone on February 8, 1999, Pat DiPlacido sent him a copy of the strawman agreement on February 9, 1999.  Pat DiPlacido also faxed a letter to Mr. Mahone on February 9, 1999.  After discussions with Pat DiPlacido and Frank DiPlacido (Pat DiPlacido's brother and Star's Vice-President), Mr. Mahone prepared a final draft of Star's response to the DeCA strawman agreement, which Pat DiPlacido faxed to Ms. Keeter at DeCA on February 16, 1999.  In communications with Mr. Mahone between

-4-

February 9, 1999 and February 16, 1999, the DiPlacido brothers had suggested changing the terms of the November 10, 1998 presentation to DeCA, so as to make the vendors' participation in the advertising program "mandatory." Yet Pat DiPlacido has testified that he knew the DeCA staff would question any such provision. The "mandatory" language did not appear in the "revised strawman agreement that Mr. Mahone prepared and Pat DiPlacido faxed to DeCA on February 16, 1999 because, despite Pat DiPlacido's and Frank DiPlacido's initial requests that the word "mandatory" be included in reference to the cooperative advertising program. After further consultation with Pat DiPlacido and Frank DiPlacido, and with their approval, Mr. Mahone prepared the "revised strawman agreement" without using the word "mandatory."

On February 18, 1999, Pat DiPlacido, Frank DiPlacido and Mr. Mahone met in Ft. Lee with Ms. Keeter (the DeCA Contracting Officer), Rex Bragaw (hereinafter, Mr. Bragaw), an assistant General Counsel for DeCA, and representatives of DeCA's Marketing Business Unit (also known as the MBU). The purpose of the meeting was to discuss the terms and language of, and resolve any issues concerning, a final written contract for the radio network project.

At the February 18, 1999 meeting, Pat DiPlacido and Frank DiPlacido requested that DeCA agree to insert the "mandatory" language concerning the cooperative advertising program into the final contract. DeCA rejected Star's request that it require its

vendors to participate in Star's "mandatory" program.

DeCA participants at the February 18, 1999 meeting all have testified that they made clear, and that they left the meeting believing that Star understood, that DeCA could not and would not enter into a contract obligating DeCA to require its vendors to purchase advertising from Star.

Pat DiPlacido has acknowledged that he was specifically told by DeCA staff at the February 18, 1999 meeting that DeCA would not require their vendors to sign up for a 1/4 of 1% to work with Star's program.

Following the February 18, 1999 meeting, Mr. Mahone and the DiPlacidos continued to revise the strawman agreement. The further revised versions of the agreement were exchanged between Mr. Mahone and Star on or about February 25, 1999. Thereafter, on March 9, 1999, Pat DiPlacido signed the final revision of the agreement and sent it to DeCA. It was executed by DeCA on March 12, 1999. In the License Agreement, Star's advertising and sales goals were targets rather than mandates.

The License Agreement called for Star to sell advertising directly to DeCA's vendors, and required DeCA to exercise its best efforts to assist Star in developing and implementing an advertising sales program to support Star's efforts to attract vendors to advertise on the network. In particular, DeCA agreed to assist Star in developing and implementing a vendor cooperative

-6-

advertising program with a targeted minimum of one-quarter (1/4) of (1) one percent participation rate designated for the Network. DeCA was to develop and implement procedures to inform vendors of the Network program and encourage their full participation in [Network] advertising and promotion opportunities available through Star and the Network.

The License Agreement contained a provision that the oral and written presentations of the contractor (Star) in responding to the DeCA RFP were incorporated into the contract. Pat DePlacido included in his November 10, 1998 oral presentation and in his contemporaneously submitted written materials statements and representations that Star would sell the advertising to be broadcast on the radio network. In the oral presentation to DeCA, Pat DiPlacido also represented that Star had national sales representatives to assist it in selling advertising. Nothing in either the Star oral presentation or the written submission suggested that DeCA would be required to have any responsibility for selling advertising for Star, or that DeCA would impose any requirement on its vendors that they purchase advertising from Star. In his November 10, 1998 presentation to DeCA, Pat DiPlacido did not tell the DeCA staff that for the program to work for Star, it had to have DeCA require its vendors to participate in a cooperative advertising program pursuant to a mandatory cooperative advertising agreement.

Star began to perform under the License Agreement shortly after the License Agreement was signed by the parties in mid-March 1999. Star installed its satellite in-store radio system in certain of DeCA's commissaries, and began selling advertising. The transaction for which Mr. Mahone (and Reed Smith) was engaged in February 1999 was, for all purposes, complete. According to Reed Smith's billing records, Mr. Mahone did not have any professional contact with Star concerning the DeCA matter from March 5, 1999 until September 2002.

In August 2002, DeCA contacted Star and requested a meeting. DeCA was concerned that Star had installed its in-store radio network in only 90 of DeCA's 270+ commissaries in the continental United States, despite the agreed-upon time line in the License Agreement that required Star to complete all the installations by November 2000. In addition, DeCA was concerned that a large number of the installations that had been installed were experiencing maintenance problems. Star agreed to the meeting, and added as an agenda item its concern that DeCA had not, in Star's view, instituted a cooperative advertising program with its vendors. The 2002 meeting took place at DeCA headquarters on September 25, 2002. This was the first time that Star had met with a DeCA Contracting Officer since February 18, 1999.  All intervening communications had been between Star and DeCA's contract specialists or other staff.  Mr. Mahone was neither advised of, nor invited to, the

-8-

September 25, 2002 meeting, and he did not attend.

At the September 25, 2002 meeting Star raised the issue of a cooperative advertising agreement, and again attempted to convince DeCA to create a mandatory cooperative advertising program. DeCA's Edna Hoogewind (hereinafter, Ms. Hoogewind) asked Frank DiPlacido if he had a copy of such a document for DeCA to review. He did not. Frank DiPlacido suggested to Ms. Hoogewind that she could find such a form on the internet. A few days after the meeting, Ms. Hoogewind sent Frank DiPlacido an e-mail to inform him that she could not find such a form, and again asked him for one.

Shortly after it received Ms. Hoogewind's e-mail communication, Star contacted Mr. Mahone and engaged him to assist Star in creating a cooperative advertising agreement to submit to DeCA. Star told Mr. Mahone that DeCA had requested proposed language for such an agreement, and asked Mr. Mahone, working in conjunction with Frank DiPlacido, to prepare a number of documents as proposals to DeCA to amend the License Agreement and initiate a mandatory program. Those documents were submitted to DeCA by Frank DiPlacido, on Star's behalf, on December 19, 2002. Among the documents was a proposed amendment to the License Agreement, as well as a proposed cooperative advertising agreement.

On June 18, 2003 the new DeCA contracting officer for the Star contract, Doreen Cadigan (hereinafter, Ms. Cadigan) wrote a letter to Pat DiPlacido, rejecting Star's proposed cooperative advertising

-9-

agreement and the proposed amendment to the License Agreement. Ms. Cadigan's letter explained that the proposed amendment, along with the other documents, would obligate DeCA to enter into a cooperative advertising agreement with its vendors and, necessarily, require its vendors to participate in Star's advertising program, something that DeCA had consistently said it would not do.

Shortly after receiving the June 18, 2003 letter from Ms. Cadigan, Pat DiPlacido consulted with Mr. Mahone regarding Star's potential responses. Thereafter, Pat DiPlacido made the business decision that Star would continue providing the in-store radio network broadcasts to DeCA commissaries, while continuing to sell advertising to DeCA vendors as it had since shortly after March 12, 1999. By letter dated June 27, 2003, Star informed DeCA that it agreed with DeCA's reading of the License Agreement; that it had known that DeCA could not enter into a contract containing the mandatory cooperative advertising program language; and that Star would continue to operate the system and sell its own advertising. Pat DiPlacido has acknowledged that the letter represented the policy of Star at that time.

No written amendment to the License Agreement was ever executed by Star and DeCA. Instead, Star performed under the License Agreement from December 2000 through December 31, 2005, the full five year term of the contract. Not only did Star continue

-10-

operating the network after receiving Ms. Cadigan's June 18, 2003 letter, but it did so under the same terms that it had been operating under, to wit: that Star would be responsible for selling its advertisements to the vendors. Pat DiPlacido testified that he continued the relationship because he still thought that Star could make a profit.   At the end of the initial term of the contract, DeCA did not terminate Star, but rather decided not to extend the License Agreement thereafter.

Following Ms. Cadigan's June 2003 denial, Star conferred with Mr. Mahone regarding its options.   He indicated to Star that any contract action was best brought after expiration of the contract term.

After the contract was terminated, Mr. Mahone referred the matter to his Litigation Department.  After meeting with Alexander Thomas and Kurt Ferstl, Reed Smith concluded that Star did have a valid breach of contract claim based on the government's failure to proceed with the CAP.   Reed Smith sent e-mails regarding the contract on January 27, 2006, February 24, 2006 and March 1, 2006.

Summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure may only be granted if the moving party shows that there is no genuine issue of material fact and that it is entitled to a judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Celotex Corp. v. Catrett, 477 U.S. 317 (1987). There are no genuine issues of material fact in dispute and this

-11-

case is ripe for summary judgment.

Star's contentions ·related to alleged transactional malpractice in February and March 1999 and alleged negligent advice in June and December 2003 include allegations that Mr. Mahone:

a. did not have the legal knowledge to represent Star in its relationship with DeCA;

b. failed to appropriately involve Reed Smith's government contracts attorneys;

c. did not do the legal work at the time to determine whether the contract he negotiated for Star was enforceable;

d. failed to represent Star competently when he recommended that Star sign a contract with an undefined material term that Mr. Mahone admitted he did not understand;

e. improperly failed to consider FAR Part 50 or other relief under federal contracting law at the time DeCA refused to go forward with the Cooperative Advertising Agreement [June of 2003] or at the time of the Pinpoint decision;

f. misinformed Star as to its prospects of increasing damages by going forward and Reed Smith's willingness to represent Star against the government.

This action was filed on June 13, 2008. Mr. Mahone performed most of his legal work for Star in Pittsburgh, PA. He made one trip to Virginia on February 18, 1999 when he and the DiPlacidos met with DeCA's staff for several hours. In deciding conflict of law matters, federal courts look to the law of the state in which they sit. <u>Klaxon Co. V. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487 (1941). The "settled rule" in Virginia is that "the *lex loci* will govern as to all matters going to the basis of the right of action itself, while the *lex fori* controls all that is connected merely

-12-

with the remedy." <u>Maryland v. Coard</u>, 9 S.E.2d 454, 458 (Va. 1940).
<u>See also</u> <u>McMillan v. McMillan</u>, 253 S.E.2d 662 (Va. 1979); <u>Jones v.
R.S. Jones Assocs. Inc.</u>, 431 S.E.2d 33 (Va. 1993); and <u>Hansen v.
Stanley Martin Cos., Inc.</u>, 585 S.E.2d 567 (Va. 2003). Statutes of
limitation are generally considered procedural, unless the
limitation is part of the same law that creates the right, such as
in wrongful death cases. <u>Jones</u>, 431 S.E.2d 34-36. Thus, Virginia's
statute of limitations should apply.

Virginia treats legal malpractice as a breach of contract for
purposes of applying its statute of limitations. "We held in <u>Oleyar
v. Kerr</u> that the statute of limitations applicable to breaches of
contract governs actions for legal malpractice, although the action
may sound in tort, because '[b]ut for the contract no duty . .
.would have existed.'" <u>MacLellan v. Throckmorton</u>, 367 S.E.2d 720,
721 (Va. 1988) (citing <u>Oleyar v. Kerr</u>, 225 S.E.2d 398, 399 (Va.
1976)). <u>See also</u> <u>Cox v. Geary</u>, 624 S.E.2d 16 (Va. 2006).

Star claims it had an unwritten contract with Reed Smith to
provide legal services. The statute of limitations in Virginia for
unwritten contracts is three years. VA. CODE § 8.01-246(4).
"Statutes of limitation are statutes of repose, the object of which
is to compel the exercise of a right of action within a reasonable
time. They are designed to suppress fraudulent and stale claims
from being asserted after a great lapse of time, to the surprise of
the parties, when the evidence may have been lost, the facts may

-13-

have become obscure because of defective memory, or the witnesses have died or disappeared." Street v. Consumers Mining Corp., 39 S.E.2d 272, 277 (Va. 1946), Truman v. Spivey, 302 S.E.2d 517, 519 (Va. 1983).

Under Virginia law the statute of limitations begins to run in legal malpractice cases when the alleged malpractice occurs. In this case, that date is March 1999 as to the alleged transactional malpractice, and in June 2003 as to the alleged negligent advice. In Keller v. Denny, the Virginia Supreme Court stated:

> Accordingly we hold that when malpractice is claimed to have occurred during the representation of a client by an attorney with respect to a particular undertaking or transaction, the breach of contract or duty occurs and the statute of limitations begins to run when the attorney's services rendered in connection with that particular undertaking or transaction have terminated, notwithstanding the continuation of a general attorney-client relationship, and irrespective of the attorney's work on other undertakings or transactions for the same client.

Keller v. Denny, 352 S.E.2d 327, 330 (Va. 1987). The Court further stated that: "When the alleged malpractice consists of a single, isolated act, Code 8.01-230 now dictates that the statute of limitations begins to run when that act is performed, regardless of the time of its discovery." Id. at 331. See also Shipman v. Kruck, 593 S.E.2d 319, 322 (Va. 2004).

The Supreme Court of Virginia has also established that the "Continuous Representation Rule" applies to allegations of legal malpractice.   Shipman v. Kruck, 593 S.E.2d 319, 324 (Va. 2004);

Keller v. Denny, 352 S.E.2d 327, 330-31 (Va. 1987).  As stated in Shipman:

> When malpractice is claimed to have occurred during the representation of a client by an attorney with respect to a particular undertaking or transaction, the breach of contract or duty occurs and the statute of limitations begins to run when the attorney's services rendered in connection with that particular undertaking or transaction have terminated.

Id. at 324 (quoting Keller, 352 S.E.2d at 330).  Such a result "is particularly appropriate to an attorney-client agreement in view of the confidence and trust inherent in that relationship."  Keller, 352 S.E.2d at 331 (quoting McCormick v. Romans, 198 S.E.2d 651, 655 (Va. 1973)).

Application of the continuous representation rule to the present matter shows that the statute of limitations did not begin to run until on or about April 11, 2006, when Reed Smith ceased providing advice to Star on the DeCA matter.

Mr. Mahone negotiated and drafted the Licensing Agreement on behalf of Star, which was executed in March 1999.  Mr. Mahone, was then called on to give attention to the matter until at least April 11, 2006.

Pat DiPlacido  communicated with Mr. Mahone in April of 1999 concerning the format a sales agreement under the contract would take.  In June of 2001 regarding Star's need to obtain data from DeCA as called for in the licensing agreement and Mr. Mahone suggested language for Star to use in its correspondence to DeCA on

-15-

that matter.   In February 2002, Pat DiPlacido had a telephone conversation about problems Star was having with DeCA under the agreement.

Mr. Mahone was called in September of 2002 to assist with the preparation of documents needed for implementation of the CAP program.   That process continued until December of 2002 when the drafts were forwarded to DeCA for approval.   In June of 2003, after DeCA rejected the December, 2002 proposal, Star consulted with Mr. Mahone regarding the appropriate response and Star's options in the face of DeCA's denial.   These discussions continued into 2006 when Star met with Alexander Thomas and Kurt Ferstl concerning potential remedies that might be available.   Reed Smith's continuing and recurring course of professional services concerning the DeCA transaction did not end until at least April 11, 2006.   Thus, this case was timely filed.

Star must prove each of the elements of legal malpractice, and must offer expert testimony with respect to the causation element of its claim.

Star has engaged three expert witnesses.   Michael L. Rigsby to testify as to ethics, L. James D'Agostino, Esquire to testify as to government contracts, and Charles Selcer, CPA, to testify as a rebuttal witness as to damages.

An expert's testimony on causation is required in this case. "Unless a [professional] malpractice case turns upon matters within

-16-

the common knowledge of laymen . . . expert testimony is required
to establish . . . that such a deviation [from the standard of
care, i.e. negligence] was the proximate cause of the claimed
damages." <u>Seaward Int'l, Inc. et al. v. Price Waterhouse</u>, 391
S.E.2d 283, 287 (Va. 1990) (accounting malpractice case)(citations
omitted) (citing <u>Raines v. Lutz</u>, 341 S.E.2d 194, 196 (Va. 1986)
(medical malpractice case).  In legal malpractice cases the rule is
the same. As the Supreme Court reiterated in <u>Gregory v. Hawkins</u>, it
is the general rule that unless the evidence of the elements of
liability "clearly lies within the range of the jury's common
knowledge and experience," expert testimony is required to
establish the existence of a duty, the breach of that duty and that
the breach of that duty was a proximate cause of the plaintiff's
damages. <u>Gregory v. Hawkins</u>, 468 S.E.2d 891, 893 (Va. 1996).  <u>See</u>
<u>also</u> <u>Heyward & Lee Constr. Co., Inc. v. Sands</u>, 453 S.E.2d 270, 272
(Va. 1995).

Mr. D'Agostino's expert report  states that it expresses "no
opinion on the contract negotiation, representation of STAR, or any
of the facts or circumstances regarding contract formation.
Specifically, we [Mr. D'Agostino or Greenberg Traurig] did not, nor
are we able to, render any opinion regarding the relationship
between STAR and Reed Smith LLP."  Instead, Mr. D'Agostino opines
only that "DeCA did exercise its "best efforts" to perform under
the Agreement . . ."   Mr. D'Agostino makes no effort to, and makes

-17-

no claim to be able to, opine on the proximate cause of the damages alleged by Star.

Mr. Rigsby's expert report provides no opinion concerning causation in this matter. His opinions are that Reed Smith's representation of Star, through Mr. Mahone, "fell below the reasonable standard of care required of a legal practitioner." There is no other opinion expressed. Mr. Rigsby never expresses any opinion with respect to whether "but for" Mr. Mahone's alleged negligence, Star would have suffered damages. Mr. Rigsby never addresses whether or not Mr. Mahone's alleged "deficiencies" proximately caused any damage to Star at all.

Mr. Rigsby's opinion is that, because Reed Smith has a government contracts group, Mr. Mahone should have consulted a government contracts lawyer. He has no opinion whatsoever as to what would or should have happened if Mr. Mahone had done so. He does not offer any causation opinion.

Mr. Selcer is a CPA who was identified by Star as a rebuttal witness to rebut the proposed testimony of Reed Smith's damages expert Jimmy J. Jackson. Mr. Selcer reviewed Mr. Jackson's report and Star's annual network expenses chart from 1999 through 2000, Star's schedule of damages, and a Star schedule of revenues and expenses for 1999 through 2006. Mr. Selcer has not audited any of the materials provided, nor has he performed any other verification or testing of the information supplied to him by Star. According

-18-

to his report, he has also not reviewed any of the data (check registers, checks, invoices, etc.) necessary to compile network expense charts, schedules of damages, or schedules of revenues and expenses. Mr. Selcer has merely taken amounts, charts and schedules provided to him by Pat DiPlacido and mechanically reproduced them in his report.

Mr. Selcer purports to address causation in this matter, yet Mr. Selcer's credentials provide no basis whatsoever for an opinion on causation. Not only does he have no qualifications to testify concerning causation, but he based his assumption of causation exclusively on Pat DiPlacido's statement to him to the effect that Star relied on Reed Smith's advice and would not have entered into the License Agreement except for that advice, and that Star was damaged in the amounts set forth in the charts and schedules Star provided to Mr. Selcer.  Mr. Selcer is unqualified to provide an expert opinion concerning causation. He merely parrots what Pat DiPlacido told him, without any expert analysis or preparation. Such evidence is inadmissable and surely insufficient to survive summary judgment.

Star has identified two expert witnesses and one rebuttal expert witness, but has not identified, and therefore cannot produce at trial, any expert witness, or expert evidence, with respect to the causation issue. Since Star has not identified any such qualified witness with respect to causation, it cannot

establish proximate cause for Star's alleged damages, nor can it establish that "but for" Mr. Mahone's negligence Star would not have been damaged.

Star must satisfy its burden of showing that its alleged business loss was in fact caused by Reed Smith's negligence, because it is clear that a lawyer may be too easily made a scapegoat for business misjudgments by his client. Star has failed to show that it can, under any set of circumstances, establish the causal link.

Star must offer expert testimony with respect to the applicable standard of care in this case, and the alleged breach of that standard by Reed Smith. This case involves a complex transactional negotiation, and the expert witnesses identified by Star either are not qualified to address the standard of care issues, or have declined to provide such standard of care opinions in their respective expert witness reports.

Neither Mr. Selcer's report nor Mr. D'Agostino's report addresses the standard of care that applies in this case, or any breach of that standard of care.

Mr. Rigsby's report broadly asserts that Reed Smith's representation of Star, through Mr. Mahone, fell below the reasonable standard of care required of a legal practitioner. Mr. Rigsby's opinions are based on what he regards as Mr. Mahone's failure to consult with any of his law partners or associates

-20-

within the government practice group and did not present the Agreement to any of his colleagues in the government practice group for counsel.

Mr. Rigsby's opinion is limited to issues having to do with the Rules of Professional Conduct, most particularly the obligations of "competence" found in Rule 1.1. Mr. Rigsby does not opine as to the competence required of a commercial or government contracts lawyer. Mr. Rigsby acknowledged that he has no expertise in commercial contracts or government contracts law, and limits his opinion only to his area of interest: legal ethics. His opinion turns, on one fact: that Reed Smith has a government contracts group and Mr. Mahone's obligation is to contact the government contracts folks and get their advice on the situation.

Mr. Rigsby offers no evidence that Mr. Mahone's alleged failure *caused* any harm and does not provide any opinion concerning the appropriate standard of care or a breach of that standard of care for an attorney practicing in commercial law or government contracts law.

Mr. Rigsby has admitted his lack of qualifications to address the standard of care and breach issues, stating that his only opinion in this case concerns a general standard of care rooted in the Rules of Professional Conduct. He acknowledges that he cannot opine on a specific standard of care or a breach of that standard of care for an attorney practicing in commercial law or government

-21-

contracts law.   In addition, Mr. Rigsby admits that he did not consult with a government contracts lawyer to determine whether the Star/DeCA License Agreement raised issues that needed to be referred to such a specialist. Mr. Rigsby has no experience or training in commercial law or government contracts law and has not consulted with any government contracts lawyer, and cannot provide testimony as expert evidence concerning the standard of care, or the breach of that standard, for a commercial lawyer or a government contracts lawyer in this situation.

The Rules of Professional Conduct make clear in their Preamble that "[v]iolation of a Rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached." "They are not designed to be a basis for civil liability . . ." Thus, Mr. Rigsby's opinion that the Rules of Professional Conduct required Mr. Mahone to consult a government contracts lawyer cannot, by itself, establish a claim of legal malpractice.

Star has identified two expert witnesses and one rebuttal expert witness, but has not identified, and therefore cannot produce at trial, any expert witness, or expert evidence, with respect to the applicable standard of care or breach of the standard issues herein.

Since the Plaintiff cannot produce evidence at trial to establish causation or standard of care elements of its case,

-22-

summary judgment must be granted.

An appropriate Order shall issue.

/s/
Claude M. Hilton
United States District Judge

Alexandria, Virginia
February 24, 2009